RUTH A. SHAPIRO (9356)
AMANDA B. MENDENHALL (15677)
ERIKA M. LARSEN (16494)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
Post Office Box 45000
Salt Lake City, Utah  84145
Telephone:  (801) 521-9000
abm@scmlaw.com
eml@scmlaw.com
ras@scmlaw.com
*Attorneys for Plaintiff*

_____

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KATRINA CLEAVELAND, an individual, <br><br> Plaintiff, <br><br> v. <br><br> WESTMINSTER COLLEGE, a Utah Corporation and Institution of Higher Education <br><br> Defendant. | **COMPLAINT AND JURY DEMAND** <br><br><br> Case No. <br><br> Judge: |

Plaintiff Katrina Cleaveland, by and through her counsel of record, hereby complains against defendant Westminster College ("Westminster"), alleges, and asserts as follows:

### PARTIES, JURISDICTION, VENUE AND TIER

1.      Katrina Cleaveland ("Katrina") is a citizen of the State of Utah, and at all times relevant resided therein.

2.      Defendant Westminster College ("Westminster") is an institution of higher education located in Salt Lake City, Utah.

3.      Upon information and belief, Westminster receives federal funding and financial assistance within the meaning of 20 USC 1681(a) and is otherwise subject to Title VI, Section 504, and the Fair Housing Act.

4.      The Court has subject matter jurisdiction over this matter pursuant to 28 USC §§ 1331, 1343, and 1367.

5.      Venue is proper in this forum pursuant to 28 USC § 1391 as the Defendant is a citizen of Utah and the events and omissions giving rise to this action occurred within the jurisdiction of this Court.

## GENERAL ALLEGATIONS

6.      Katrina was raised in Monroe, Utah and is a graduate of Richfield High School in Sevier County, Utah.

7.      Katrina is a first-generation college student as neither of her parents nor any of her grandparents attained higher education.

8.      As discussed below, Katrina suffers from several disabilities, so she understood the importance of selecting a college that was sensitive to her disabilities and offered the right environment for her success. Attending, participating, and succeeding in college are top priorities for Katrina.

9.      After looking at several institutions of higher education, Katrina chose to attend Westminster because she was led to believe it would provide the environment necessary for her to attend college and succeed, including a Legacy Program designed with students like her in mind.

10.      To qualify for the Legacy program at Westminster, students must be first generation college students and identify with a traditionally underrepresented population like a racial

minority, a person with disabilities, or a person with a marginalized gender identity, expression, or sexuality.

11.     Katrina applied for and was accepted to Westminster. Katrina was awarded a Legacy Scholarship and a placed in the Legacy Program.

12.     Katrina qualified for this program under a number of categories, including as a disabled person.

13.     As part of the Legacy "family," Katrina spends a lot of time supporting, learning from, and engaging with people from varying racial, cultural, social, and economic backgrounds.

### Katrina's Disabilities

14.     Katrina suffers from a degenerative condition that resulted in severe hearing loss by the time she graduated from high school.

15.     As a result, Katrina relies on hearing aids to hear, communicate, and function in her everyday life.

16.     The use of hearing aids does not completely correct Katrina's hearing loss, resulting in a continued need for other accommodations, including the presence of a service animal to alert Katrina to people approaching or nearby, knocks on her door, emergencies, etc.

17.     Katrina is also a survivor of sexual abuse.

18.     As a survivor, Katrina suffers from severe symptoms related to Anxiety, Depression, and Post Traumatic Stress Disorder (PTSD).

19.     Katrina additionally suffers from Attention-Deficit/Hyperactivity Disorder (ADHD).

20.     As a result of these conditions, Katrina also utilizes her service animal to provide her with certain necessary services for her well-being and sense of security. These include, but are

not limited to, notification when persons are present or approaching Katrina's person or home, the reassurance of safety and security, and therapy work that includes the compression of certain pressure points to relieve stress.

21.     Katrina's service animal is a 50 lb Australian Cattle Dog named Todd ("Todd").

### Katrina's Initial Housing Issues – Freshman Year

22.     In order to attend Westminster, Katrina needs to live in student housing because Katrina's family and home are hours away in Monroe, Utah.

23.     Student housing ("Housing") at Westminster does not allow students to own pets. However, in compliance with federal law and according to Westminster's own policies, Housing permits service animals as a reasonable accommodation for persons with disabilities.

24.     Katrina is one such person entitled to this reasonable accommodation.

25.     Katrina applied for and was approved to live in Housing during her 2017 – 2018 year ("Freshman Year").

26.     Katrina arrived at Westminster without Todd, but during her Freshman Year, Katrina sought approval from Westminster's Disability Services Office for her service animal to live with her on campus and accompany her to classes and school activities.

27.     Katrina filled out the appropriate paperwork and was approved to have Todd come live with her at Westminster in her campus housing.

28.     Also during her Freshman Year, Katrina became more involved in the Residence Hall Association (RHA).

29.     RHA is a leadership group that acts as "the voice for students living on campus, and is comprised of Westminster students and overseen by a Westminster staff advisor.

30.     At the time Katrina started becoming involved with RHA, Sierra Krippner was the RHA staff advisor.

31.     Katrina attended weekly RHA meetings, where she brought Todd as her service animal. During these meetings, Todd behaved appropriately and was not a disturbance.

32.     As part of RHA, Katrina was offered an opportunity to attend a conference in Idaho. Katrina understood it was in preparation for her to assume the role of RHA vice president for the following school year.

33.     Todd is essential to help Katrina navigate unfamiliar places with her hearing loss, PTSD, and Anxiety. Therefore, Katrina sought approval for Todd to attend the conference from Ms. Krippner as the RHA staff advisor.

34.     Ms. Krippner was reluctant to allow Katrina to bring her service animal to the conference, citing her belief that the hotel would not allow Todd.

35.     However, after Katrina continued to express her need to bring Todd, Ms. Krippner told Katrina she could bring Todd—but only if she received the proper approval from the conference's host hotel and the hosting college. Katrina did so, and the hosts granted her request for accommodation without condition.

36.     Katrina and Todd were completely welcomed by the conference hosts and other conference goers who were complimentary of Todd's good behavior.

37.     During the conference, Todd excelled at his service responsibilities, and sat quietly through all meetings and engagements.

38.     Halfway through the conference, however, RHA's vice president claimed that Todd growled at someone. Not only is growling uncharacteristic for Todd, not one other person present heard it.

39.     Nonetheless, Westminster RHA leadership banished Katrina and Todd to the back of the room during the remainder of the conference where she had difficulty hearing the presentations and could not actively participate.

40.     Katrina attempted to talk with Ms. Krippner about this, but Ms. Krippner dismissed Katrina's objections. She further told Katrina that she was lucky to even attend the conference with Todd.

41.     Because of Ms. Krippner's distain and refusal to assist Katrina in securing reasonable accommodation, Katrina felt ostracized and shunned because of her disabilities and need for accommodation.

42.     On the way home from the conference, Westminster RHA leadership forced Katrina and Todd to sit in the very back of the van despite an abundance of empty seats elsewhere. Katrina alerted Westminster RHA leadership that she gets carsick in the rear passenger seat when traveling long distances, but they insisted that Katrina and Todd ride in the very back of the van.

43.     Because of her hearing loss, sitting in the back of the van made it difficult for Katrina to hear and participate in any of the group's conversations or discussions. As a result, Westminster RHA leadership purposefully excluded Katrina from participating with the rest of the group unlike the other non-disabled students.

44.     After the conference Katrina attended in preparation to assume her role as vice president the following year, Katrina met with RHA leadership.

45.     During this meeting, Westminster RHA leadership told Katrina that she was "not fit" for the position as vice president and cited her ADHD as one reason for the decision.

46.     Due to Katrina's preparation and training, including her attendance at the conference, Katrina was qualified to take the position of Vice President.

6

47.      However, RHA leadership told Katrina that the other person chosen for the position was a "better fit," despite not having attended the conference or being otherwise qualified.

48.      On information and belief, that person is not disabled and does not require reasonable accommodations.

49.      After this meeting, Katrina spoke with Ms. Krippner who confirmed that the reason Katrina was "fired" from RHA included Katrina's strategies for managing her ADHD. Ms. Krippner also expressed annoyance about Todd's attendance at the conference.

**Continued Housing Problems – Freshman Summer/Sophomore Year**

50.      Toward the end of Katrina's Freshman Year, Karnell Black assumed the role of Vice President of Student Affairs.

51.      Around this time (May/June 2018), there was no active Director of Housing at Westminster, but Katrina discovered that Mr. Black, in coordination with Ms. Krippner, would give students their housing assignments for the following school year ("Sophomore Year").

52.      Katrina and several friends requested an apartment together for their Sophomore Year. These roommates knew Katrina needed Todd to live in the apartment and agreed to accommodate it. However, after Mr. Black became involved, Katrina learned that she was assigned to different housing than her requested roommate group.

53.      Katrina subsequently alerted Mr. Black, Ms. Krippner, and Housing to the fact that she needed to live with her service animal on campus, effectively renewing her request for this reasonable accommodation for her disabilities.

54.      Mr. Black, Ms. Krippner, and Housing placed Katrina in a housing unit with roommates who were allergic to dogs, thereby denying her request for reasonable accommodation.

55.     Katrina reported her roommates' allergies to Mr. Black, Ms. Krippner, and Housing, but instead of moving the non-disabled students to different units, Mr. Black, Ms. Krippner, and Housing uprooted Katrina and moved her to a different unit off-campus.

56.     Katrina, her parents, and her academic advisors told Mr. Black, Ms. Krippner, and Housing that off-campus housing was not a reasonable alternative accommodation in light of Katrina's recorded and known disabilities.

57.     Nonetheless, Mr. Black, Ms. Krippner, and Housing assigned Katrina to a new unit in Westminster's off-campus housing called "The Draw."

58.     After Katrina had settled in to her new apartment, which Katrina presumed would be her housing for the entire year, Katrina discovered a new roommate was scheduled to move in who claimed to be allergic to dogs.

59.     Katrina again informed Mr. Black of this situation, but instead of assigning that student to another apartment, Mr. Black told Katrina that she and Todd had to relocate yet again. Katrina and her family objected to the reassignment over the course of several months.

60.     Other students offered to move to accommodate Katrina's need for her service animal.

61.     Despite this, and over Katrina's objections, Housing uprooted Katrina, once again, and forced her to move to a different unit.

62.     In July 2018, Westminster hired Jess Sweitzer as Director of Housing, which Katrina hoped would improve her housing situation and Westminster's prior reluctance to accommodate her disabilities.

63.     Nonetheless, Katrina's housing situation became more hostile, and Mr. Black, Ms. Krippner, and now Ms. Sweitzer continually put Katrina in environments not conducive to her need for a service animal as an accommodation.

64.     In fact, during her Freshman Summer (2018) and early in her Sophomore Year, Mr. Black, Ms. Sweitzer, and Housing continually ignored Katrina's need for roommates with no dog allergy. Katrina was forced to move eight times over the course of nine months, and spent many months held hostage not knowing when she would be forcefully uprooted again.

65.     Throughout this time, Katrina was frequently uprooted and her living situation changed at a moment's notice, simply because of her need for reasonable accommodations for her known disabilities.

66.     Because of this, Katrina felt singled out by Mr. Black, Ms. Krippner, and Ms. Sweitzer with regard to her disability and need for accommodation in housing.

67.     Not surprisingly, the instability in Katrina's housing situation was extremely stressful for Katrina and caused significant flare-ups in her Anxiety, Depression and PTSD.

68.     Katrina's mother, Lisa Cleaveland, even attempted to remedy this situation and secure reasonable accommodation for her daughter by requesting intervention from Westminster's Office of the President, but the President's office simply referred her back to the Dean of Students' office and, in turn, directly back to Mr. Black, the very same person that was purposefully making it difficult for Katrina to receive the accommodation she required.

69.     Mr. Black was then aware of Katrina's attempts to escalate her concerns over Mr. Black and report his discrimination to his superiors.

70.     Westminster, Mr. Black, and Ms. Sweitzer knew Katrina was disabled and needed and requested reasonable accommodation, yet her requests were continuously ignored or discounted.

71.     Westminster's, Mr. Black's, and Ms. Sweitzer's treatment of Katrina and the resulting isolation led to significant aggravation of Katrina's PTSD, Anxiety, and Depression.

72.     Due to this, Katrina experienced suicidal ideation and she relapsed into practicing self-harm as a coping mechanism, despite not doing so for over four years.

73.     These aggravated symptoms and the relapse in her mental illnesses led to a significant decline in Katrina's grades, and Westminster placed her on academic probation.

74.     Prior to this, Katrina had done well in school and had not been put on academic probation.

### The Roommate Change

75.     At the end of her Sophomore Year, Katrina lived in The Draw with one roommate, Rhett Kimura.

76.     Ms. Kimura planned to move out of student housing at the end of Katrina's Sophomore Year. Katrina anticipated new roommates for the 2019 – 2020 academic year ("Junior Year").

77.     Katrina intended to return to campus in the fall with her service animal. However, Katrina learned that she was paired with someone who was allergic to dogs once again, without any proposal for a reasonable alternative accommodation for Katrina's disabilities.

78.     Ms. Kimura moved out of their shared apartment after the May Term, 2019.

79.     During Ms. Kimura's move-out process, there were several individuals in and out of the unit including Ms. Kimura's and Katrina's family and friends.

80.     Katrina did not move out at this time, and planned to stay in the same unit during her Junior Year. Katrina left her belongings in the unit and spent much of the summer at home in Monroe.

81.     When Katrina returned to campus to begin the 2019 – 2020 academic year, she discovered that Ms. Kimura left a number of her personal belongings in the unit, including a hand-drawn picture stuck to the back of their shared front door.

82.     Ms. Kimura and her friend Mike Vitek created the drawing while hanging out in Ms. Kimura's and Katrina's shared apartment at the end of the prior school year.

83.     Katrina did not participate in its creation.

84.     On information and belief, Ms. Kimura and Mr. Vitek hung the drawing on the back of the front door using stickers found in the living room.

85.     Ms. Kimura and Mr. Vitek are both significantly taller than Katrina and hung the drawing at their eye-level, well above Katrina's normal field of sight. Katrina is 5'2".

86.     Although Katrina was generally aware that there was a drawing was hanging on the back of the door, she never looked at it in any detail. She was therefore not aware of its content.

**The Initial Report**

87.     Shortly after arriving back to school, Zoe Kalapos, moved into the unit.

88.     Ms. Kalapos never mentioned the presence or contents of the drawing to Katrina.

89.     On August 21, 2019, Kate Mackin, moved into the apartment.

90.     The following day, Ms. Mackin confronted Katrina by asking Katrina if she "hated Jews."

91.     Katrina was completely befuddled and did not understand what Ms. Mackin could possibly be talking about. Katrina asked for clarification, but Ms. Mackin just continued to ask Katrina whether she "hated Jews."

92.     Finally, Ms. Mackin referenced the drawing on the back of the front door, but Katrina remained confused because she had never noticed the detailed contents of the drawing.

93.     Katrina physically went to the door and removed the illustration in order to see the details. This was the first time Katrina noticed the drawing contained anti-Semitic language and hateful images.

94.     Katrina was, understandably, horrified to find this in her home.

95.     Katrina has dedicated much of her adolescent and adult life helping and defending minority and disadvantaged groups. In fact, Katrina works at an after-school program that primarily services underprivileged children of minorities. Additionally, Katrina's participation in the Legacy "family" results in significant work with a number of minority groups.

96.     Katrina apologized to Ms. Mackin profusely and explained she did not create the drawing and had no idea what was in it.

97.     After this confrontation, Katrina retreated to her room until there was a knock at the apartment door. Westminster Campus Patrol and Ms. Sweitzer were there because of a report that an offensive picture was in the apartment.

98.     Katrina retrieved the drawing from the trashcan in her room and gave it to Campus Patrol and Ms. Sweitzer. Katrina told them that she had not drawn it or posted it in the apartment, and had not realized what it depicted.

99.     Ms. Sweitzer was aware of and personally involved with housings ongoing discrimination and forced removal of Katrina by continually uprooting her and forcing her to move in response to requests for reasonable accommodation.

100.    Nevertheless, in response to this event, Ms. Sweitzer told Katrina she had to move to Apartment 207 in Stock Hall.

101.    Moving Katrina in such a situation is contrary to Westminster's Housing policy, which states that the remedy for such cases is that "[s]tudents will be asked to remove material from public view if it is considered offensive, obscene, or a continual disruption to the college."

102.    Because of Katrina's Anxiety and PTSD disorder, and in light of the previous months of continued discriminatory and retaliatory actions from Housing, Katrina experienced a significant panic attack. She texted her mother that she thought she had to withdraw from school and move home because of this incident.

103.    Her mother immediately called, but Katrina hung up after a little over a minute because she was overwhelmed by the entire situation. Katrina became so distraught with the presence of Campus Patrol and Ms. Sweitzer's insistence that she had to move, yet again, she cried so hard her nose bled.

104.    Ms. Sweitzer and Campus Patrol made Katrina go to Westminster's counseling center because she was so visibly distraught and inconsolable. Ms. Sweitzer further instructed Katrina not to speak with her mother until after she had been to counseling.

105.    Campus Patrol transported Katrina directly to the counseling center.

106.    There, Katrina met with Molly Butterworth in confidence regarding the incident, her reaction, and her overall anxiety related to the incident. During this meeting, Katrina was still

in crisis and experiencing significant anxiety and panic symptoms. Eventually, Katrina was released from the counseling center, and she returned to her apartment.

### Mr. Black's Confrontation

107.     Katrina subsequently called Campus Patrol to determine how to get the keys to the new apartment previously mentioned by Ms. Sweitzer.

108.     Campus Patrol referred the question to Mr. Black as Dean of Students. Mr. Black called Katrina that same night to discuss her new housing assignment. Mr. Black made no comment or reference to suspension or any other disciplinary action.

109.     Mr. Black followed-up with Katrina later that evening with an e-mail that asked her to "meet at 9:45 am [the next day] to get keys to your new space[.]"

110.     Katrina responded to Mr. Black's e-mail the next morning at approximately 9:30 a.m. and told Mr. Black she was headed over to his office to get the keys.

111.     Katrina grabbed her ID card and headphones and walked to Mr. Black's office. Katrina did not bring her hearing aids because she cannot use both her headphones and her hearing aids at the same time. Katrina did not think she needed them because Mr. Black led her to believe that she was simply picking up the keys to her new unit.

112.     Once at Mr. Black's office, however, Mr. Black closed the door, effectively cornering Katrina, and began to interrogate her about the drawing.

113.     Because Katrina felt cornered, she asked to call her mom. Mr. Black said no. Katrina asked for a lawyer. Mr. Black told her no.

114.     Katrina tried to tell Mr. Black that she did not have her hearing aids. Mr. Black knows Katrina has significant hearing loss, but he repeatedly cut her off.

115.    For the first time, Mr. Black suggested that Katrina may be suspended and/or expelled.

116.    Mr. Black also pressured Katrina to provide the names of the individuals involved in the drawing.

117.    Finally, Mr. Black let Katrina call her mother. Katrina told her she was meeting with Mr. Black and that the situation they thought had been resolved was significantly graver than Katrina was previously told.

118.    Katrina's mother, Lisa Cleaveland, informed both Katrina and Mr. Black that she would immediately drive up to Salt Lake City and to expect her in two hours. Mr. Black finally allowed Katrina to leave his office until her mother arrived.

**Katrina's Initial Suspension**

119.    Without Katrina's knowledge, Mr. Black subsequently convened a Threat Assessment and Behavior Intervention Committee (TABIC) meeting wherein Julie Freestone, (HR) Arikka Von (Marketing and Communications), Tony Russel (Campus Security), Corey Shipp and Molly Butterworth (Crisis Counselors), and Katherine Holmes (General Counsel) were present.

120.    Molly Butterworth was the same counselor Katrina was forced to meet with the prior evening at Ms. Sweitzer's insistence.

121.    TABIC's purpose is to "to formalize the college's processes of addressing behavior that may be threatening, disruptive, or harmful."

122.    Mr. Black serves as chairman of this Committee and was present and participated in the meeting.

123.    No meeting minutes or notes were taken, and no recording or transcript was made.

124.     On information and belief, TABIC considered "evidence" from the Campus Patrol report, as well as Mr. Black's own follow-up investigation and personal discussions with Ms. Sweitzer. Ms. Sweitzer purportedly told Mr. Black that she personally heard Katrina admit to her mother that Katrina created the drawing herself.[1]

125.     Katrina never admitted to her mother that she created the drawing. In fact, Katrina expressly told her mother she had nothing to do with the drawing and did not even know its contents.

126.     That afternoon Katrina and Ms. Cleaveland returned to Mr. Black's office.

127.     Mr. Black threatened expulsion for the presence of the drawing in Katrina's room, but told Katrina she would not be disciplined if she simply gave him the names of the two individuals involved in the creation of the drawing.

128.     Despite not wanting to "tattle-tell," but because Mr. Black was threatening expulsion, Katrina cooperated and told Mr. Black that Ms. Kimura and Mr. Vitek drew and hung the picture in the apartment.

129.     Mr. Black suspended Katrina from campus. Mr. Black indicated the suspension was for her own safety, but assured her that Westminster intended to investigate the incident further.

130.     Ms. Cleaveland and Katrina were both under the impression that it was a short suspension only for the weekend. Both Ms. Cleaveland and Katrina believed that Katrina could return to campus the following week for class and work.

---

[1] This false statement was later exposed during the independent investigation discussed below.

131.    Instead, the following day (a Saturday), Mr. Black issued a formal suspension letter to Katrina that informed her that he was "imposing on [her] this interim suspension from the college, which includes denial of access to campus property, all classes and activities."

132.    The suspension was for an undetermined length of time "pending the outcome of the college's internal investigation and disciplinary procedures."

133.    Katrina was therefore explicitly barred from returning to campus for any reason at least until she met with Mr. Black on Wednesday, August 28, 2019 at 3:00 p.m.

134.    Katrina was also suspended from housing and not allowed back to her apartment.

135.    Katrina's family lives three hours away in Monroe, Utah, and Katrina does not have any family in Salt Lake County with whom she can stay.

136.    Mr. Black was aware of Katrina's housing situation and her need for access to student housing.

137.    The suspension letter threatened to have Katrina arrested for trespass if she returned to campus prior to their meeting.

138.    This suspension effectively rendered Katrina homeless.

139.    Mr. Black explained the reason behind this complete suspension was to "take appropriate steps to protect all of its students and property" due to the "level a (sic) detail and threat in [the] drawing[.]"

140.    TABIC's decision to suspend Katrina was purportedly because it had determined that Katrina posed a threat, but to whom and for what remains unclear.

**Total Suspension Lifted; Housing Suspension Enforced**

141.     On August 27, 2019, before the scheduled meeting with Katrina, Mr. Black sent Katrina an e-mail that informed her that he was "amend[ing] the restriction of the interim suspension" pending the outcome of an independent investigation.

142.     Apparently, Westminster and Mr. Black eventually concluded Katrina was not an actual threat to the campus community.

143.     As a result, Katrina was now allowed "to be on campus to attend meetings in response to this matter, attend class, and utilize academic and wellness support resources (ex. writing center, tutoring services, counseling services, and student health services)."

144.     However, Katrina was still banned from housing for the entirety of the independent investigation.

145.     Mr. Black knew that, based upon Katrina's situation, removing her from housing would significantly hinder her access to campus, including her classes and work.

146.     Mr. Black knew that unstable housing was unhealthy for Katrina's documented mental illnesses.

147.     For the entirety of the investigation, Katrina was homeless. Nevertheless, she did her best to attend her classes and keep up on her obligations, believing the investigation would prove she was not responsible for the drawing and Westminster would therefore lift the suspension.

148.     As will be discussed more fully below, on information and belief, the investigation was simply a pretext to effectively remove Katrina from Housing altogether.

### Independent Investigation and Notice of Determination

149.     In the August 27, 2019 email, Mr. Black also stated that he had removed himself from the investigation, and turned it over to Kat Thomas at the Equal Opportunity Office (EOO) instead.

150.     Ms. Thomas sent a separate letter that stated the EOO retained independent outside counsel, Tyler Dever of the law firm Richards Brandt Miller & Nelson, to conduct an investigation of the incident that involved the drawing.

151.     Specifically, Katrina was under investigation to determine whether she was guilty of Complicity ("any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act of prohibited conduct by another person."); and/or Harassment, defined as "[u]nwelcome conduct directed against another person that is based on one or more of that person's protected characteristics or statuses, and that has the purpose of unreasonably interfering with the person's employment, academic performance, or participation in College programs or activities; or creating a working, learning, program or activity environment that a reasonable person would find intimidating, hostile or offensive."

152.     Ms. Thomas said that at the conclusion of her investigation Ms. Dever would report her findings to the EOO.

153.     Ms. Dever subsequently conducted a series of interviews related to the incident.

154.     On information and belief, Ms. Dever interviewed Ms. Sweitzer, Ms. Kimura, Mr. Vitek, Ms. Mackin, and Katrina. During those interviews, it appears Ms. Dever obtained the following information:

     a.  Ms. Sweitzer *falsely* reported that she heard Katrina admit to her mother that she had drawn the picture;

     b.  Katrina denied telling her mother that she had drawn the picture;

     c.  Katrina denied knowing about the contents of the picture;

     d.  Ms. Cleaveland denied that Katrina told her she had drawn the picture, and presented evidence of text messages between she and her daughter that occurred

during the incident (when Ms. Sweitzer claimed she heard Katrina's confession) that directly and conclusively confirmed that Katrina never told her mother she was involved in the drawing;

e.  Ms. Cleavelend stated that she too had been in and out of the apartment many times and never noticed the content of the picture;

f.  Ms. Kimura and Mr. Vitek admitted they drew the illustration and hung it in the apartment; and

g.  Mr. Vitek did not believe that Katrina participated in drawing the picture.

155.    On information and belief, Ms. Dever also reviewed and considered several documents, including a campus police report and documentation related to the "follow-up" investigation personally performed by Mr. Black.

156.    At the close of Ms. Dever's investigation, she submitted an investigation report (the "Report").

157.    Ms. Dever notified Katrina (and counsel) that she had concluded her investigation and submitted the Report to Westminster on September 13, 2019.

158.    Katrina requested a copy of the Report from Ms. Dever, but Ms. Dever told Katrina she could not give her a copy because it belonged to Ms. Dever's client, Westminster. Ms. Dever told Katrina to ask the Westminster for it.

159.    On September 13, 2019, Katrina reached out to Ms. Thomas at the EEO regarding Ms. Dever's findings and, again, to request a copy of the Report.

160.    Ms. Thomas confirmed that Westminster had the Report, but said she was no longer involved in the investigation or determination process, but that Julie Freestone and Mr. Black, both originally involved in the TABIC meetings and original suspension, were now back in charge.

161.     Ms. Thomas refused to provide a copy of Ms. Dever's report to Katrina.

162.     Katrina subsequently reached out to Julie Freestone on Monday, September 16, 2019 to request a copy of the Report and inquire about the status of the investigation.

163.     Ms. Freestone refused to provide Katrina a copy of Ms. Dever's report, but stated she intended to meet with Mr. Black and Katrina on Wednesday, September 18, 2019 at 4:00 p.m. to present Westminster's notice of determination ("Notice").

164.     Ms. Freestone also refused to provide a copy of the Notice in advance of the meeting.

165.     Ms. Freestone and Mr. Black met with Katrina to deliver the Notice to Katrina. A copy of the Notice is attached hereto as **Exhibit A**.

166.     Ms. Freestone and Mr. Black refused to give Katrina a copy of Ms. Dever's report. The Notice did, however, include some of Ms. Dever's factual findings.

167.     According to the Notice, Ms. Dever concluded that although Katrina was aware of the drawing hanging in the apartment, she found "no evidence to support the claim that [Katrina] was specifically aware of the anti-Semitic imagery."

168.     Ms. Dever further concluded that she found "no evidence to support that [Katrina] contributed to the drawing . . . [or] the specific anti-Semitic symbols or contents of the drawing."

169.     In her report, Ms. Dever stated she that confirmed with one of the two individuals who actually drew the picture, Mr. Vitek, that Katrina did not participate in the drawing.

170.     Mr. Vitek admitted that he drew the picture with Ms. Kimura.

171.     Despite Ms. Dever's factual findings, Ms. Freestone concluded that Katrina violated Westminster's Equal Opportunity Policy and found her guilty of "Complicity" or guilty

of an "act taken with the purpose of aiding, facilitating, promoting, or encouraging the commission of an act of prohibited conduct [i.e. harassment] by another person."

172.    Ms. Freestone's conclusion was based solely on the length of time the picture hung, unnoticed, in Katrina's apartment, an apartment shared with Ms. Kimura, one of the two artists who actually created the anti-Semitic drawing.

173.    In consultation with one another, Ms. Freestone and Mr. Black imposed a sanction for this policy violation and "placed [a] residence hall suspension and deferred suspension" that concludes Katrina is not "allowed to live on campus for one year from [September 17, 2019]."

174.    The Notice further states that if Katrina violates or breaks any other college policy prior to graduation, she will be immediately expelled. Effectively giving Westminster the right to kick Katrina out at almost any moment with very little cause.

175.    Mr. Black explained that he personally thought Katrina needed time to "think about what she had done" and "learn" from this experience.

176.    It is unclear exactly what Katrina "had done" that required her to "learn" from the experience, with the exception of her failure to independently discover the discriminatory content of the drawing and remove the picture.

177.    In fact, several Westminster employees and/or contractors also did not discover the discriminatory content of the drawing during the months it was displayed in the apartment. Including, but not limited to: (1) campus patrol who were previously called to the unit; (2) RAs who performed a "health and safety check" of the entire apartment just prior to fall semester; (3) a paint crew tasked to examine every wall and door in the unit to identify, paint, and repair them; and (4) Westminster cleaning personnel.

178.    Mr. Black's laser focus was only on Katrina.

179.     In fact, on information and belief, Mr. Black did not convene TABIC to determine whether Mr. Vitek or Ms. Kimura were threats to themselves or others, including Katrina, despite drawing a picture that depicted beheaded humans with swastikas on their foreheads, 'a dead man hanging from a noose in a tree that bears the inscription "God Wills It"', and a group of cloaked individuals beneath the tree wherein the leader has a quote bubble with the words "We must purge the land of the Jewish disease."

180.     On information and belief, Westminster did not initiate any investigatory or disciplinary proceedings or issue any sanctions against Mr. Vitek or Ms. Kimura.

181.     On information and belief, Mr. Black was not concerned about Mr. Vitek and Ms. Kimura's anti-Semitic threats and hate.

182.     On information and belief, Mr. Vitek and Ms. Kimura are not disabled, have not requested reasonable accommodation from Westminster, and have not reported prior instances of discrimination by Housing and specifically, Mr. Black.

183.     Mr. Black's and Westminster's excuses for Katrina's suspensions include protecting the student body from harassment, yet Mr. Black and Westminster failed, and continues to fail, to protect Katrina from the same harassment. Despite conclusive knowledge that Katrina did not participate in the drawing nor know its contents, Westminster and Mr. Black continued to target Katrina instead of protect her.

## The Appeal

184.     On September 25, 2019, Katrina submitted a formal appeal of the determination because, among other reasons, Mr. Black and Ms. Freestone were clearly biased. They both participated in TABIC, heard confidential information Katrina told Ms. Butterfield when Ms. Sweitzer and Campus Patrol forced her to go to counseling, Mr. Black conducted his own

independent investigation, and Mr. Black and Ms. Freestone then completely disregarded the independent findings to make their own decisions about Katrina's alleged complicity and subsequent punishment.

185.    Katrina's appeal also cited procedural error because the findings of fact concluded that Katrina had no knowledge of the content and anti-Semitic messaging of the picture, making it impossible for her to be guilty of complicity because it requires an element of purposeful knowledge. Ms. Freestone and Mr. Black disregarded the findings to find Katrina guilty of complicity without any basis in fact.

186.    Because Westminster's policies require the appeal to be submitted to Ms. Freestone, the same person already involved in every step of the process, Katrina requested that Westminster recuse Ms. Freestone and Mr. Black from the appeal.

187.    On September 30, 2019, Katrina learned that Debbie Tahmassebi was appointed as the hearing officer for her appeal.

188.    Ms. Tahmassebi told Katrina that, pursuant to Westminster's appeal procedure, "[w]ithin ten school days of their appointment, the appeal panel will meet at a mutually agreeable time to consider the information provided to them and to determine whether the determination should be upheld."

189.    On October 4, 2019, Ms. Tahmassebi confirmed that an appeal committee had been appointed and "[t]he group will be meeting next Wednesday, October 9."

190.    On October 14, 2019, Katrina requested an update regarding her appeal, and Ms. Tahmassebi reported that "the appeal committee had the first meeting" the prior week, and "[t]here is no other update beyond that at this point."

191.    Ten school days from the appointment of Katrina's appeal panel passed on October 18, 2019.

192.    From October 14, 2019 to December 4, 2019, Katrina received no further update regarding the status of her appeal.

193.    On December 4, 2019, Katrina received a one-page letter from Debbie Tahmassebi regarding the outcome of her appeal. See "Letter", attached hereto as **Exhibit B**.

194.    The Letter states that the appeal panel "determine[d] that there were two instances of *substantial* procedural error." However, the Letter fails to give any specific information regarding that finding.

195.    Nonetheless, "[a]fter reviewing their [the panel's] concerns, and requesting additional information from the investigator," Ms. Tahmassebi completely disregarded the appeal panel's findings and conclusions. She instead summarily concluded "there is no basis for the determination of procedural error." But, yet again, provided no other specific information in support of her deviation from the appeal panel's findings.

196.    In violation of its own policies, Westminster made Katrina wait 61 days from the time the appeal panel was appointed for its decision.

197.    At the time of the filing of this complaint, Katrina has been without a permanent residence for 109 days.

## COUNT I
## Violation of Section 504 – Discrimination/Harassment

198.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

199.    Katrina is a person with documented severe hearing loss, severe Anxiety, Depression, PTSD, and ADHD that substantially limits her ability to function in one or more of her life activities.

200.     Katrina is therefore disabled as defined in Section 504 of the Rehabilitation Act of 1973 ("Section 504").

201.     Despite her disabilities, Katrina is qualified to attend and was admitted by Westminster to complete her post-high school education. Katrina was also qualified to reside in Westminster student housing and participate in RHA.

202.     On information and belief, at all relevant times herein, Westminster received and still receives federal funding as defined in Section 504.

203.     Katrina requested reasonable accommodation for her disabilities.

204.     Defendants intentionally discriminated against Katrina when they exhibited indifference and annoyance to Katrina's reasonable requests for accommodation that ultimately denied her the benefits of services, educational opportunities, and activities, including fair housing, because she is deaf and suffers from Anxiety, Depression, PTSD and ADHD.

205.     Defendants intentionally discriminated against Katrina by denying her reasonable and effective communication through the use of appropriate auxiliary aids and services, including but not limited to, access to her hearing aids during disciplinary meetings with the Dean of Students.

206.     Defendants intentionally discriminated against Katrina when they exhibited deliberate indifference to Katrina's request that Housing screen potential roommates for dog allergies and repeatedly forced her to relocate.

207.     The Office of the President intentionally discriminated against Katrina when it failed to follow Westminster policies to engage EOO after receiving a report of discrimination against a student. Instead, the Office of the President referred Katrina and her mother back to the very same department that was discriminating against Katrina in the first place, informing that

26

office of Katrina's complaints. As a result, Katrina endured increased discrimination and retaliation.

208.    Defendants knew, or had reason to know, that interference with Katrina's use and access to stable housing would aggravate her Anxiety, Depression and PTSD.

209.    Defendants knew, or had reason to know, that Katrina's academic success, ability to function, and equal access to Westminster's programs were substantially affected by Defendants' apathetic attitudes to Katrina's requests for reasonable accommodations.

210.    Defendants knew that Katrina's ability to continue her education at Westminster was necessitated by her access to student housing and intentionally targeted this necessary resource in an attempt to effectively dismiss her from school.

211.    Defendants' discrimination was intentional and/or constituted deliberate indifference.

212.    Westminster has not educated their agents and/or employees regarding Section 504, nor has it corrected discriminatory policies and practices in order to comply with Section 504 and its regulations.

213.    As a direct result of Defendant's actions, Katrina suffered, and continues to suffer, both physical and emotional harm.

214.    Katrina has been, and continues to be, monetarily damaged in an amount to be determined at trial.

### COUNT II
### Violation of Section 504 – Retaliation

215.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

216.     Katrina is a disabled individual and therefore entitled to reasonable accommodations under Section 504.

217.     Katrina requested reasonable accommodation when she (1) sought to be paired with roommates that were not allergic to dogs; and (2) asked not to be continually uprooted from her home during the academic semester.

218.     When Mr. Black, Ms. Sweitzer, and Westminster's Housing Department refused to accommodate Katrina's reasonable request for accommodation that gave her equal access to educational and housing opportunities, Katrina's mother reported to the Office of the President that her daughter was the victim of discrimination by Mr. Black and Housing personnel.

219.     The Office of the President thereafter informed Mr. Black of this complaint and effectively referred Katrina back to him, deferring to his judgment and authority instead of listening to and investigating Katrina's complaints of discrimination.

220.     Katrina and/or her representative was engaged in a protected activity when she (1) requested reasonable accommodation for her known disabilities; and (2) reported the discrimination and disparate treatment to the Office of the President.

221.     In retaliation for inconveniencing housing with her requests for accommodation, and subsequently reporting the discrimination to the Office of the President, Defendants retaliated by (1) excluding Katrina from equal participation in the RHA program, forcing her to sit in the back of the van, and denying her the position of Vice President because of known disabilities; (2) denying Katrina access to fair housing by continually pairing her with allergic roommates; (3) forcing Katrina to move eight times in nine months to deliberately inconvenience her and cause her harm; (4) using the actions of other individuals (Ms. Kimura and Mr. Vitek) to punish Katrina and suspend her from housing, despite findings that Katrina had no knowledge or involvement of

the hateful conduct; and (5) threatening immediate suspension and/or expulsion with no reasonable grounds to do so.

222.     Defendant's excuses for these adverse actions against Katrina are merely a pretext for its disapproval of and annoyance by Katrina's disabilities, requests for reasonable accommodations, and report of discrimination to the Office of the President.

223.     Other non-disabled students at Westminster have been treated differently. In fact, neither Ms. Kimura nor Mr. Vitek were investigated or disciplined for the offensive content contained in the illustration.

224.     As a result, Katrina has suffered and continues to suffer both physical and emotional harm.

225.     Katrina has been, and continues to be monetarily damaged in an amount to be proven at trial.

<u>**COUNT III**</u>
<u>**Violation of the Fair Housing Act – Discrimination / Failure to Accommodate**</u>

226.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

227.     Katrina is a person with documented severe hearing loss, Anxiety, Depression, PTSD, and ADHD that substantially limits one or more of her life activities.

228.     Katrina is therefore disabled, and a member of a protected class under the Fair Housing Act (FHA), 42 USC § 3601, *et seq*.

229.     Katrina was qualified to rent student housing at Westminster's housing complexes.

230.     Katrina requested reasonable accommodation from Westminster Housing for her disabilities, and Defendant knew of Katrina's need for reasonable accommodation.

231.    Specifically, Katrina requested reasonable accommodation when she (1) sought to be paired with roommates that were not allergic to dogs; and (2) asked not to be continually uprooted from her home during the academic semester.

232.    Defendant intentionally discriminated against Katrina when it exhibited indifference to Katrina's reasonable requests for accommodation that ultimately denied her the benefits of services, educational opportunities, and activities, including fair housing, because she is deaf and suffers from Anxiety, Depression, PTSD and ADHD.

233.    Defendant intentionally discriminated against Katrina when it exhibited deliberate indifference to Katrina's request that housing screen potential roommates for dog allergies and repeatedly forced her to relocate.

234.    Defendant intentionally discriminated against Katrina when it continually removed and uprooted Katrina from her housing instead of other non-disabled students, which constituted disparate treatment and effectively denied her fair and stable housing under FHA.

235.    The Office of the President intentionally discriminated against Katrina when it failed to follow Westminster policies to engage EOO after receiving a report of housing discrimination against a student. Instead, the Office of the President referred Katrina and her mother back to the very same department that was discriminating against Katrina in the first place, informing Mr. Black and Housing of the discrimination complaint and, thereby, initiating the retaliation described herein.

236.    Defendant knew, or had reason to know, that interference with Katrina's use and access to stable housing would aggravate her Anxiety, Depression and PTSD.

237.     Defendant knew, or had reason to know, that Katrina's academic success, ability to function, and equal access to Westminster's programs were substantially affected by Defendants' apathetic attitudes to Katrina's requests for reasonable accommodations under the FHA.

238.     Defendant knew that access to student housing is necessary to Katrina's ability to continue her education at Westminster, and Defendant intentionally targeted this fundamental resource in order to try to effectively dismiss her from school.

239.     Defendants' discrimination was intentional and/or constituted deliberate indifference.

240.     Westminster has not educated their agents and/or employees regarding the FHA, nor has it corrected discriminatory policies and practices in order to comply with the FHA and its regulations.

241.     As a direct result, Katrina has suffered, and continues to suffer, both physical and emotional harm.

242.     Katrina has also been, and continues to be, monetarily damaged in an amount to be proven at trial.

### COUNT IV
### Violation of the Fair Housing Act – Retaliation

243.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

244.     Katrina is a disabled individual entitled to reasonable accommodation under the FHA.

245.     As such, Katrina requested reasonable accommodation when she (1) sought to be paired with roommates that were not allergic to dogs; and (2) asked not to be continually uprooted from her home during the academic semester.

246.     When Mr. Black, Ms. Sweitzer, and Housing refused to accommodate Katrina's reasonable request for accommodation that gave her equal access to educational and housing opportunities, Katrina's mother reported to the Office of the President that her daughter was the victim of discrimination by Mr. Black and Housing personnel.

247.     Katrina and/or her representative was engaged in a protected activity when she (1) requested reasonable accommodation for her known disabilities; and (2) reported the discrimination and disparate treatment to the Office of the President.

248.     In retaliation for inconveniencing housing with her requests for accommodation, and subsequently reporting the discrimination to the Office of the President, Defendant retaliated by (1) denying Katrina access to fair housing by continually pairing her with allergic roommates; (2) forcing Katrina to move eight times within nine months to deliberately inconvenience her and cause her harm; and (3) using the actions of other individuals (Ms. Kimura and Mr. Vitek) to punish Katrina and suspend her from housing, despite findings that Katrina had no knowledge or involvement of their hateful conduct; and (4) threatening immediate suspension and/or expulsion with no reasonable grounds to do so.

249.     Defendant's excuses for these adverse actions against Katrina were merely a pretext for their disapproval and annoyance of Katrina's disabilities, requests for reasonable accommodations, and her mother's report of discrimination to the Office of the President.

250.     Other non-disabled students at Westminster were treated differently. In fact, neither Ms. Kimura nor Mr. Vitek were investigated or disciplined for the offensive content contained in the illustration.

251.     As a result of this targeted retaliation, Katrina has suffered, and continues to suffer, both physical and emotional harm.

252.    Katrina has also been, and continues to be, monetarily damaged in an amount to be proven at trial.

## COUNT V
## Intentional Infliction of Emotional Distress

253.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

254.    Defendant engaged in outrageous and intolerable conduct, thereby offending generally accepted standards of decency and morality, when, among other things, it (1) denied Katrina access to fair housing by continually pairing her with allergic roommates; (2) forced Katrina to move eight times within nine months to deliberately inconvenience her and cause her harm; (3) cornered Katrina alone in an office and denied her access to representation, her parents, and her auxiliary hearing devices despite knowledge of her disabilities and her history of abuse; (4) threatened expulsion to leverage information regarding her peers; (5) initiated unsubstantiated investigative and disciplinary proceedings against Katrina as a pretext for discrimination; and (6) disregarded the findings of both an independent investigator and the appeal panel in an attempt to maintain its pretext for continued discrimination and retaliation.

255.    As discussed previously, Defendants intentionally engaged in this behavior and either knew or should have known that such emotional distress would result because Defendant was aware of Katrina's existing physical and emotional disabilities, her need for reasonable accommodation for those disabilities, and the reality that Katrina's educational success at Westminster was directly tied to her access to student housing.

256.    As a result of Defendants' outrageous conduct, Katrina experienced severe emotional distress, including, but not limited to, (1) severe increase in physical and emotional symptoms related to PTSD, Anxiety and Depression; (2) relapse of self-harm; (3) suicidal ideation; (3) nose bleeds; (4) inability to sleep; and (5) stomachaches.

257.    As a result of this targeted retaliation, Katrina has suffered, and continues to suffer, both physical and emotional harm.

258.    Katrina has also been, and continues to be, monetarily damaged in an amount to be proven at trial.

## COUNT VI
## Negligent Infliction of Emotional Distress

259.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

260.    Defendant engaged in conduct that it should have realized involved an unreasonable risk of causing emotional distress to Katrina when, among other things, it (1) denied Katrina access to fair housing by continually pairing her with allergic roommates; (2) forced Katrina to move eight times within nine months to deliberately inconvenience her and cause her harm; (3) cornered Katrina alone in an office and denied her access to representation, her parents, and her auxiliary hearing devices despite knowledge of her disabilities and history of abuse; (4) threatened expulsion to leverage information regarding her peers; (5) initiated unsubstantiated investigative and disciplinary proceedings against Katrina as a pretext for discrimination; and (6) disregarded the findings of an independent investigator and the appeal panel in an attempt to maintain its pretext for continued discrimination and retaliation.

261.    Defendant should have realized that this conduct could cause emotional distress resulting in illness or bodily harm because Defendant was acutely aware of Katrina's existing physical and emotional disabilities, her need for reasonable accommodation for those disabilities, Katrina's history as an abuse survivor, and the reality that Katrina's educational success at Westminster was directly tied to her access to student housing.

262.    As a result of Defendants' conduct, Katrina experienced severe emotional distress, including, but not limited to, (1) severe increase in physical and emotional symptoms related to

PTSD, Anxiety and Depression; (2) relapse of self-harm; (3) suicidal ideation; (3) nose bleeds; (4) inability to sleep; and (5) stomach aches.

263.    As a result of this targeted retaliation, Katrina has suffered, and continues to suffer, both physical and emotional harm.

264.    Katrina has also been, and continues to be, monetarily damaged in an amount to be proven at trial.

## COUNT VII
## Declaratory Relief

265.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

266.    Katrina has a statutorily protectable interest in access to fair housing and a fair and discrimination-free school and housing environment.

267.    Because Katrina relies on access to campus housing for her success as a Westminster student and the intangible importance of a clear educational record for continued education and future employment, monetary relief is insufficient to avoid irreparable harm.

268.    Katrina has suffered, and will continue to suffer, irreparable harm due to Defendant's discrimination and refusal to reinstate Katrina's student housing by marring her permanent educational file with a bogus and discriminatory disciplinary action.

269.    Katrina is therefore entitled to declaratory relief that:

  a.  Finds Katrina not guilty of "Complicity";

  b.  Orders Westminster to remove the fabricated finding from Katrina's education file;

  c.  Orders that Westminster cannot expel Katrina without due process as threatened in the Notice; and

  d.  Orders Westminster reinstate Katrina into campus housing with appropriate accommodation for her disabilities.

## COUNT VIII
## Injunctive Relief

270.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

271.     Katrina has a statutory protectable interest in access to fair housing and a fair and discrimination-free school and housing environment.

272.     Because Katrina relies on access to campus housing for her success as a Westminster student, Katrina has suffered, and will continue to suffer, irreparable harm due to Defendant's discrimination and refusal to reinstate Katrina's student housing for the Spring 2020 semester.

273.     As a local Utah college, Westminster is subject to the jurisdiction of the Court and any injunctive relief can be enforced by this Court. Moreover, ongoing review and/or supervision of such injunctive relief would not be necessary.

274.     On information and belief, Westminster will not be harmed by the injunctive relief sought by Katrina. There was never a finding that Katrina posed a danger to other students. However, as demonstrated, without such injunctive relief, Katrina will suffer irreparable harm.

275.     Katrina is, therefore, entitled to injunctive relief that reinstates her campus housing for the Spring 2020 semester.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Katrina Cleaveland prays for and demands judgment and relief as follows:

1.     Injunctive relief that orders Defendant to reinstate Katrina's access to campus housing for the Spring 2020 semester;

2.     An order that Westminster find Katrina not guilty of Complicity and remove the finding from her permanent educational file;

3.      An order that Westminster may not expel Katrina without due process;

4.      For an award of economic, noneconomic, general, special, and punitive damage in amounts to be proven and supported at trial, including pre- and post-judgment interest;

5.      For costs of suit incurred in bringing and prosecuting this action, including attorneys' fees and costs; and

6.      For such other and further relief as the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiff Katrina Cleaveland hereby demands a trial by jury on all applicable counts.

DATED this 11th day of December, 2019.

SNOW, CHRISTENSEN & MARTINEAU


/s/ Amanda B. Mendenhall
Ruth A. Shapiro
Amanda B. Mendenhall
Erika M. Larsen
*Attorneys for Plaintiff*

4825-2281-4638, v. 1